**Adrienne GOBUTY and Michael Gobuty, Plaintiffs,**

v.

**Brian F. KAVANAGH, M.D., Mayo Clinic, St. Mary's Hospital, Defendants.**

**ST. MARY'S HOSPITAL, Counter–Claimant,**

v.

**Adrienne GOBUTY, Counter–Defendant.**

**Civ. No. 4–91–380.**

United States District Court, D. Minnesota, Fourth Division.

June 1, 1992.

Allan F. Shapiro, Goff, Kaplan, Wolf & Shapiro, North St. Paul, Minn., for plaintiffs.

William R. Stoeri, Creighton R. Magid, Stacey M. Fuller, Dorsey & Whitney, Minneapolis, Minn., Benjamin R. Hippe, Mayo Clinic, Legal Dept., Rochester, Minn., for defendants.

## MEMORANDUM AND ORDER

MacLAUGHLIN, Chief Judge.

This matter is before the Court on defendants' appeal of the January 31, 1992 order of the United States Magistrate Judge. The order will be affirmed.

FACTS

This is a medical malpractice action brought by plaintiffs Adrienne and Michael Gobuty against defendants Brian F. Kavanagh, M.D., Mayo Foundation, and St. Mary's Hospital. Plaintiffs, citizens of Canada, allege that the defendants were negligent in their care and treatment of Ms. Gobuty's left hip. Jurisdiction is premised upon diversity of citizenship.

Plaintiffs brought this action in May 1991. On June 7, 1991, counsel for defendants sent a medical authorization form to plaintiffs' counsel and asked that it be executed and returned. The proposed authorization would have permitted Ms. Gobuty's treating physicians to release copies of her medical records and to consult privately with defendants' attorneys. Instead of executing this form, plaintiffs provided limited authorizations entitling defendants to obtain all medical records, but not to hold ex parte interviews.

Defendants brought a motion to compel Ms. Gobuty to sign an authorization form permitting ex parte interviews. By order of January 31, 1992, 141 F.R.D. 136, the Magistrate Judge denied defendants' motion, concluding that the waiver of the physician-patient privilege did not extend to allowing defense counsel private interviews. The Magistrate Judge first determined that because this case is premised upon diversity jurisdiction, Minnesota state law governs the issue of privilege. Under Minn.Stat. § 595.02, subd. 5, a plaintiff, by commencing a medical malpractice action, waives the physician-patient privilege as to any information in the possession of his treating physicians. This waiver permits a defendant to informally communicate with plaintiff's treating physicians if the physicians so consent, so long as the defendant notifies the plaintiff at least fifteen days in advance and permits plaintiff's authorized representative to be present at any such discussions. The Magistrate Judge interpreted subdivision 5 as conditioning the scope of plaintiff's waiver, and consequently the defendants' right to conduct informal discussions, upon notification and the opportunity of plaintiffs to be present. In so holding, the Magistrate Judge rejected defendants' argument that the portion of the statute affording plaintiffs the right to notice and to be present was procedural in character which, in accordance with *Erie v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), did not apply in the federal courts.

This matter is now before the Court on defendants' appeal from the Magistrate Judge's order. The Court may modify or set aside any portion of the order found to be clearly erroneous in fact or contrary to law. 28 U.S.C. § 636(b)(1)(A); Fed.R.Civ.P. 72(a); D.Minn. LR 72.1(b)(2).

## DISCUSSION

■ The issue before the Court involves the physician-patient privilege. Because this is a diversity case, the Court must follow Minnesota law as to the existence and scope of the privilege. *Cerro Gordo Charity v. Fireman's Fund Am. Life Ins. Co.*, 819 F.2d 1471, 1477 (8th Cir.1987) (citing Fed.R.Evid. 501); *Filz v. Mayo Found.*, 136 F.R.D. 165, 168 (D.Minn.1991). While the common law did not recognize a physician-patient privilege, *see State v. Staat*, 192 N.W.2d 192, 195 (Minn.1971), Minnesota has adopted one by statute. Minn.Stat. § 595.02 provides in relevant part:

> A licensed physician ... shall not, without the consent of the patient, be allowed to disclose any information or any opinion based thereon which the professional acquired in attending the patient in a professional capacity, and which was necessary to enable the professional to act in that capacity....

Minn.Stat. § 595.02, subd. 1(d).

■ State law also controls what constitutes a waiver of the physician-patient privilege. *Lind v. Canada Dry Corp.*, 283 F.Supp. 861, 863 (D.Minn.1968). In Minnesota, a plaintiff, by filing a medical malpractice action, automatically waives the privilege to the extent provided by statute:

> A party who commences an action for malpractice ... against a health care provider ... waives in that action any [physician-patient] privilege.... This waiver must permit all parties to the action ... to informally discuss the information or opinion with the health care provider if the provider consents. Prior to an informal discussion with a health care provider, the defendant must mail written notice to the other party at least 15 days before the discussion. The plaintiff's attorney ... must have the opportunity to be present at any informal discussion.

Minn.Stat. § 595.02, subd. 5.

Before this waiver provision was enacted, the Minnesota Supreme Court in *Wenninger v. Muesing*, 307 Minn. 405, 240 N.W.2d 333 (1976) held that while a plaintiff automatically waived the privilege by placing his health in issue, that waiver did not extend to allowing the defendant ex parte contact with plaintiff's treating physicians. The plaintiffs in that case commenced a medical malpractice action against defendant physician. Pursuant to Minn.R.Civ.P. 35.03, which provides for a waiver of the medical privilege when a party places his health in issue, plaintiffs executed medical authorizations supplied by the defendant. Plaintiffs revoked their authorizations upon learning that the defendant intended to privately interview their other treating physicians. Defendant moved the trial court for an order directing plaintiffs to provide him with an authorization permitting ex parte interviews. The trial court granted defendant's motion, and plaintiffs promptly applied to the supreme court for a writ of prohibition. Defendant argued that the required waiver was coextensive with the scope of the privilege; in other words, if the plaintiffs placed their health in issue, they completely, not partially, waived the privilege. Defense counsel should therefore be free to conduct ex parte interviews of plaintiffs' treating physicians. In response, plaintiffs contended that the waiver was limited, extending only to written medical records and, in certain instances, a deposition of the treating physician. Private interviews, according to the plaintiffs, were still precluded by the privilege.

The supreme court, agreeing with the plaintiffs, concluded that the waiver was limited and did not go so far as to permit ex parte interviews of plaintiffs' treating physicians. *Id.* 240 N.W.2d at 336. According to the court, Rule 35.04, which limits the scope of the privilege's waiver to the disclosure of medical records and the taking of the physician's deposition, "is, and ought to be, the exclusive means by which an adverse party may discover testimony relating to a patient's physical, mental, or blood condition...." *Id.* The court reasoned that the waiver was based upon Minnesota's policy of requiring the full disclosure of all relevant medical evidence. Rule 35.04 implemented this policy by allowing access to this evidence according to an orderly discovery procedure. *Id.* This

procedure, the court continued, best protects both the patient and the physician. First, the presence of the patient's attorney permits the patient to know what his doctor's testimony is, allays fears that his doctor may inadvertently disclose personal confidences, and best preserves the complete trust essential to the successful treatment of the patient. *Id.* at 337. Second, the presence of the patient's attorney protects the doctor from unwittingly and improperly disclosing medical information about his patient, which could subject the doctor to sanctions such as tort liability or the suspension or revocation of his license. *Id.* at 337 & n. 3. In the court's view, the only justification for permitting ex parte physician interviews was to provide defense counsel with a possible tactical advantage. Balancing the interests involved, the court determined that this possible tactical advantage did not justify "exposing doctors to the hazard of potential tort liability for unwarranted disclosures of confidential information in private, nonadversary interviews . . . ." *Id.* at 337. The court rejected defendant's argument and crafted a rule prohibiting all ex parte interviews absent a plaintiff's consent.

Ten years after *Wenninger* was decided, the legislature amended Minn.Stat. § 595.02 to include the automatic waiver provision. *See* 1986 Minn.Laws ch. 455 § 84, at 881. This amendment relaxed the *Wenninger* rule by redefining the scope of the waiver to include informal discussions, subject to a plaintiff's right to fifteen days' notice and the opportunity to be present. The Minnesota Supreme Court construed subdivision 5 in *Blohm v. Minneapolis Urological Surgeons, P.A.*, 449 N.W.2d 168 (Minn.1989). The plaintiff in that case brought a medical malpractice action in state court against certain physicians, alleging negligent treatment following cancer surgery. After the cut-off date for formal discovery, defense counsel notified the plaintiffs pursuant to Minn.Stat. § 595.-02, subd. 5 that he would be conducting an "informal discussion" with a different physician that had also examined the plaintiff. The trial court denied defendants leave to conduct this discussion, and, after the

Minnesota Court of Appeals denied relief, the defendants sought a writ of prohibition in the supreme court.

The supreme court thus framed the issue: "[i]s an 'informal discussion' conducted pursuant to section 595.02, subd. 5, a form of discovery and therefore subject to a court rule barring discovery beyond a date certain?" *Blohm*, 449 N.W.2d at 169. Relying upon *Wenninger*, the court observed that while ex parte interviews of the waiving party's treating physician were impermissible, nothing prevented defense counsel from interviewing a physician if done with "full permission of the patient and his attorney." *Id.* at 170 (quoting *Wenninger*, 240 N.W.2d at 337). The court then discussed the effect of the enactment of subdivision 5:

> It is apparent that the 1986 statute was designed to minimize the difficulties of obtaining an interview by eliminating plaintiff's right to veto. If the treating doctor consents and if 15 days' notice and an opportunity to attend is given plaintiff, defense counsel may informally discuss the case with the doctor. ·

*Blohm*, 449 N.W.2d at 170. In the case before the supreme court, both of those prerequisites were satisfied.

The court then rejected the argument that "informal discussions" constituted a form of discovery that should be prohibited after the discovery cut-off date. According to the court, the informal discussions authorized by section 595.02, subd. 5 simply did not constitute a discovery procedure. *Id.* Discovery, the court reasoned, contemplates the gathering of information under the auspices of the court. If a witness chooses to talk to an attorney, this is not discovery as that term is generally understood. However, the court suggested that physicians are different from other witnesses. The court cited *Weaver v. Mann*, 90 F.R.D. 443 (D.N.D.1981) for the proposition that private communications with plaintiff's doctors are generally impermissible. Only if the plaintiff is given fifteen days' notice and the opportunity to attend in accordance with the statute may the defendant communicate with the plaintiff's

treating physicians. If the physician were then to refuse to be interviewed, the defendant could resort to taking the physician's deposition. *Blohm*, 449 N.W.2d at 170. Because the defendant in *Blohm* met these two prerequisites, the court concluded that the discovery cut-off date did not affect his right to conduct informal discussions with plaintiff's treating physicians.

■ With this background on Minnesota's law governing the physician-patient privilege in mind, the issue in this case is whether this Court, sitting in diversity, must enforce subdivision 5 and require that defendants give plaintiffs fifteen days' notice and the opportunity to be present at any informal discussions with Ms. Gobuty's treating physicians. Plaintiffs argue that the Court must enforce the statute. According to plaintiffs, federal courts sitting in diversity must apply state law so long as state law does not conflict with federal law. Plaintiffs contend that the two requirements of subdivision 5 do not conflict with federal procedural law, because the federal rules are silent as to whether ex parte physician interviews are permissible. Rather, plaintiffs allege that subdivision 5 merely qualifies the scope of the privilege's waiver and thus represents an integral part of a comprehensive legislative review of medical malpractice actions in Minnesota. In addition, enforcing the state statute would allegedly discourage forum shopping. Plaintiffs claim that defendants in malpractice cases would otherwise remove cases to federal court in order to gain easier access to plaintiffs' treating physicians. Finally, plaintiffs contend that applying the statute would prevent the inequitable administration of the law by furnishing federal medical malpractice plaintiffs the same rights and protections afforded to state plaintiffs. Plaintiffs therefore request that this Court affirm the Magistrate Judge's order.

Defendants respond that they are entitled to authorizations permitting ex parte interviews. Defendants agree that state law determines the existence and application of privilege. However, they argue that federal law controls the methods of discovery in diversity cases. Contrary to the court's finding in *Blohm*, defendants argue that the Minnesota legislature, by enacting subdivision 5, merely created a form of liberalized discovery that requires notice and the opportunity to be present as procedural safeguards. The *Blohm* court, it is argued, noted that the procedures outlined in subdivision 5 must be separated from the rest of that subdivision. By failing to distinguish between the waiver of the privilege and the procedures for conducting informal discussions, the Magistrate Judge's order denying their motion, defendants claim, is contrary to law and must be reversed.

In support of their position, defendants rely upon *Filz v. Mayo Foundation*, 136 F.R.D. 165, 168 (D.Minn.1991). Plaintiffs in that case, both residents of Wisconsin, brought a medical malpractice action against the Mayo Foundation and the Rochester Methodist Hospital. Defendants asked Ms. Filz to sign a medical authorization permitting them to confer privately with her treating physicians. She refused, and defendants brought a motion to compel. The Magistrate Judge denied the motion, but allowed defendants to interview Ms. Filz's physicians in the presence of her attorney. Defendants appealed, arguing that the Magistrate Judge's order disregarded controlling precedent holding that federal procedural law governs the type of authorization that a plaintiff must sign in a diversity action, and further that federal law permits ex parte interviews. In response, plaintiffs argued that Minnesota privilege law, rather than federal procedural rules, controls disputes regarding the scope and protections provided by the physician-patient privilege.

The court noted that state law controls whether federal courts recognize the physician-patient privilege as well as what constitutes a waiver of that privilege. *Id.* at 167 (citing Fed.R.Evid. 501). Noting that Minnesota adopted such a privilege by statute, the court observed that section 595.02, subd. 5 sets forth in particular the two procedures—notice and the opportunity to be present—that must be followed in medical malpractice cases if a defendant seeks

to conduct an informal interview with a treating physician. Construing *Blohm,* the court determined that subdivision 5 does not provide critical protection to the physician-patient privilege, but rather was intended to provide defense counsel with easier access to a plaintiff's treating physicians. As such, subdivision 5 does not represent a conditional waiver of the privilege, but is merely an "extension of the informal information gathering permitted under state law." *Id.* at 172.

The court then turned to the role of ex parte contacts in the federal courts. Although no federal rule explicitly permits ex parte interviews, the court noted that both federal and state courts allowing such interviews have characterized them as more a form of discovery rather than an aspect of a plaintiff's waiver of a privilege. Therefore, subdivision 5 was deemed by the court to be procedural, contrary to the holding in *Blohm.*

The court next turned to the effect of such a conclusion. Relying upon *Walker v. Armco Steel Corp.,* 446 U.S. 740, 749–50, 100 S.Ct. 1978, 1984–85, 64 L.Ed.2d 659 (1980), the court espoused the following two-pronged rule. In situations where there is a direct conflict between federal and state procedural law, courts must apply the federal procedural rule. *Filz,* 136 F.R.D. at 173. Where there is merely an apparent conflict, the first question is whether the scope of the federal rule at issue is sufficiently broad so as to control. If not, courts must then apply an additional two-step analysis under *Walker* to determine whether state law must be followed. First, the court must determine whether the state law under consideration is an integral part of a state substantive scheme. Second, application of state law should further at least one of the policy considerations articulated in *Erie:* 1) to discourage forum shopping; or 2) to prevent the inequitable administration of the law. *Id.*

The *Filz* court then applied its multifaceted test. After determining that subdivision 5 neither directly conflicted with a federal rule of procedure nor was preempted by the federal rules, thereby satisfying

the first part of the test, the court conducted the two-step *Walker* analysis. In examining whether subdivision 5 constituted an integral part of a state substantive scheme, the court noted that the physician-patient privilege was not intended to be used by a plaintiff for strategic purposes. Subdivision 5, the court observed, liberalized access to treating physicians once the privilege has been waived. Further, the *Blohm* court had construed subdivision 5 as an extension of information gathering, so it was essentially a procedural mechanism. The *Filz* court therefore concluded that subdivision 5, as a procedural statute, was not an integral part of Minnesota privilege law.

While this conclusion actually disposed of the issue, the *Filz* court nevertheless proceeded to the second part of the *Walker* test. The plaintiffs argued that subdivision 5 was analogous to Minnesota's statute that precludes pleading punitive damages in the initial complaint. *See* Minn. Stat. § 549.191. Most federal courts have decided that this statute applies in diversity cases. *See, e.g., Zeelan Indus. Inc. v. de Zeeuw,* 706 F.Supp. 702, 705 (D.Minn.1989); *Kuehn v. Shelcore Inc.,* 686 F.Supp. 233, 234 (D.Minn.1988) (noting that the punitive damages statute is aimed at deterring past abusive pleading practices regarding punitive damages in order to address a perceived insurance crisis). The *Filz* court rejected plaintiffs' analogy. The court reasoned that the punitive damages statute was enacted to minimize unfounded claims by restricting the timing and method of pleading. In distinguishing between section 549.191 and section 595.02, subd. 5, the court determined that failing to follow the informal interview procedures in diversity actions would not undercut the policies underlying subdivision 5, unlike the situation with the punitive damages statute. The court did not elaborate on this perceived difference.

The *Filz* court also determined that refusing to apply the informal interview procedures, unlike the case with the punitive damages statute, would not encourage forum shopping. Before subdivision 5 was enacted, the *Wenninger* rule precluded all

informal interviews absent a patient's consent. Without addressing whether federal courts sitting in diversity had actually applied the *Wenninger* rule in the past, the *Filz* court suggested that if plaintiffs sought to avoid informal interviews they were more likely to file in state court. The enactment of subdivision 5, while eliminating plaintiffs' right to veto interviews entirely, did not change the fact that plaintiffs generally would prefer the protections afforded by the state statute. Looser federal requirements would encourage defendants to remove to federal court. Yet this difference, according to the court, could not be considered impermissible forum shopping, given that removal is already a right belonging to out-of-state defendants.

Finally, the court determined that refusing to apply the informal interview requirements would not result in the inequitable administration of the law. Plaintiff had argued that failing to apply the statutory safeguards against the defendants, two giants in the medical community with world-wide influence, would completely undermine subdivision 5. Rejecting this argument, the court determined that most Minnesota federal courts permit ex parte interviews in all types of lawsuits, not just medical malpractice actions. *Filz*, 136 F.R.D. at 175. In light of this, refusing to allow private interviews, as opposed to requiring notice and the opportunity to be present, could be viewed, the court reasoned, as the inequitable application of the law by drawing a procedural distinction based solely on the subject matter of the litigation. Finally, the court concluded that the plaintiffs could not have relied upon the protections afforded by the statute because of its then recent enactment. The court neglected to observe, however, that before the enactment of subdivision 5, all ex parte interviews with plaintiffs' treating physicians were prohibited by *Wenninger*.

In short, the *Filz* court concluded that subdivision 5 constituted a form of informal discovery, one that did not directly conflict with the Federal Rules of Civil Procedure. Because there was no direct conflict, the court refused to apply state law unless it were an integral part of some state substantive scheme that furthered the *Erie* policies of either discouraging forum shopping or preventing the inequitable administration of the law. The court, finding that none of these requirements had been satisfied, therefore set aside the Magistrate Judge's order as contrary to law and ordered Ms. Filz to sign an authorization permitting ex parte communication with her doctors.[1]

The Court respectfully disagrees with the *Filz* court's analysis because it affords inadequate deference to state law. The issue, as properly recognized in *Filz*, is whether subdivision 5 must by applied by the Court where, as here, it sits in diversity. The proper standard for resolving this question was articulated in *Kuehn v. Shelcore, Inc.*, 686 F.Supp. 233 (D.Minn.1988).

The issue in *Kuehn* was whether federal courts sitting in diversity must enforce a Minnesota statute precluding the pleading of punitive damages in the initial complaint. Concluding that the state statute must be applied, the court announced the following rules for determining the role of state statutes in federal proceedings. First, the court must determine whether the state statute directly conflicts with a federal rule of procedure on point. *Id.* at 234. If so, the court must apply the federal rule so long as the rule is constitutional and within the scope of the Rules Enabling Act, 28 U.S.C. § 2072. *Id.* (citing *Walker*, 446 U.S. at 749–750, 100 S.Ct. at 1984–85; *Hanna v. Plumer*, 380 U.S. 460, 469–71, 85 S.Ct. 1136, 1143–44, 14 L.Ed.2d 8 (1965)). If there is no direct conflict between the federal rule and the state statute, then the court must apply the *Erie* doctrine analysis. *Kuehn*, 686 F.Supp. at 234 (citing *Walker*, 446 U.S. at 752, 753, 100 S.Ct. at 1985, 1986). Contrary to the *Filz* court's understanding, "[t]hat analysis does not consist of a mere mechanical determination whether the state provision is 'procedural'

---

1. Defendants also rely on *Thomsen v. Mayo Found.*, No. 4-84-1239, 1986 WL 9159 (D.Minn. 1986). However, defendants' reliance is misplaced because the *Thomsen* court did not address the informal interview process set forth in subdivision 5.

or 'substantive' since even a so-called procedural provision can have such a substantial effect on the litigation as to require its application under *Erie.*" *Kuehn*, 686 F.Supp. at 234. Rather, the *Erie* analysis has evolved into a broader inquiry: whether the variation between litigation with the state statute enforced and without it enforced "is substantial enough to raise equal protection problems or influence the choice of forum." *Id.* at 234 (citing *Walker*, 446 U.S. at 753, 100 S.Ct. at 1986; *Hanna*, 380 U.S. at 468, 85 S.Ct. at 1142). This variation need not mean the difference between full recovery and no recovery; even a nondispositive variation which may significantly influence the choice of forum by providing a mere tactical advantage is sufficient reason to apply the state law in federal proceedings. *Kuehn*, 686 F.Supp. at 235; *accord Zeelan*, 706 F.Supp. at 705.

The Court thus disagrees with the result in *Filz* for three general reasons. First, instead of determining whether enforcing the statute could affect the choice of forum, the *Filz* court engaged in an analysis that essentially judged the merits of the state law. Second, by implicitly categorizing the state statute as procedural, and making a determination based upon that classification, *Filz* ignores the fact that the *Erie* doctrine has evolved into a more pragmatic inquiry. The issue is not whether the statute is procedural or substantive; rather, it turns on whether applying the statute significantly affects the litigation. Third, *Filz* suggests that federal courts are not to apply state statutes unless the statutes, among other things, reflect an integral part of some state substantive scheme. This position reflects too narrow a reading of the *Erie* doctrine.

In this case, the parties agree that subdivision 5 does not directly conflict with a particular federal rule. According to the *Kuehn* standard, then, the Court must apply the state statute if the difference between litigation with the statute enforced and without it enforced has the potential to affect the choice of forum. *Kuehn*, 686 F.Supp. at 235; *accord Zeelan*, 706 F.Supp. at 705. Contrary to the *Filz* court's conclusion, the Court finds that permitting ex parte interviews of plaintiffs' treating physicians in federal court, while not allowing them in state court, would significantly influence a defendant's decision to remove to federal court.

As the Magistrate Judge recognized, defendants would remove cases solely to gain greater and easier access to plaintiffs' expert witnesses. This private access could enable defendants to obtain statements that would later be used to impeach plaintiffs' experts. *See Bohrer v. Merrill–Dow Pharmaceutical, Inc.*, 122 F.R.D. 217, 218 (D.N.D.1987). Because plaintiffs' counsel would not have been present at any informal interviews, any prior inconsistent statements would likely come as a complete surprise at trial. Defendants would thus receive a tactical advantage, which was recognized in *Wenninger*, by litigating medical malpractice cases in federal court as opposed to state court. This tactical advantage in and of itself justifies the application of subdivision 5 in federal proceedings. *See Kuehn*, 686 F.Supp. at 235.

Further, permitting private interviews in federal court while prohibiting them in state proceedings would result in the inequitable administration of the law. Subdivision 5 protects the physician-patient relationship. The parties do not dispute that the requirements of subdivision 5 must be met if the medical malpractice action has been brought in state court. If the Court sitting in diversity were to refuse to enforce the state statute, then the physician-patient relationship would be afforded less protection in federal proceedings than in state proceedings. As the Magistrate Judge observed, "[t]here appears to be no Federal policy in favor of affording the confidential relationship of a physician and a patient a greater degree of privilege in the diversity action brought in Federal Court than the same relationship would enjoy in a state court action in the same jurisdiction." Magis. J. Order, Jan. 31, 1992, 141 F.R.D. at 141 (quoting *Lind*, 283 F.Supp. at 865). Conversely, it follows that there is no reason to afford the physician-patient relationship less protection in federal proceedings than in state proceedings.

Permitting ex parte interviews would do just that. Because allowing ex parte interviews would give the defendants a tactical advantage in federal court, and would also afford the physician-patient privilege less protection than in state court, this Court will enforce subdivision 5 and affirm the Magistrate Judge's order.[2]

Based on the foregoing, and upon all the files, records and proceedings herein,

IT IS ORDERED that the January 31, 1992 order of the Magistrate Judge is affirmed.

**2.** Even if the Court were to come to the opposite conclusion under the *Kuehn* analysis and hold that subdivision 5 need not be applied by federal courts sitting in diversity, the Court is not convinced that the federal rules generally permit ex parte interviews of plaintiffs' treating physicians. Although there appears to be no circuit court authority on point, the federal district courts that have dealt directly with this issue seem to be split, with a slight majority concluding that ex parte interviews are impermissible. *Compare Felder v. Wyman,* 139 F.R.D. 85 (D.S.C.1991) (federal rules permit ex parte interviews of plaintiffs' treating physicians) *and MacDonald v. United States,* 767 F.Supp. 1295 (M.D.Pa.1991) (same) *and Sklagen v. Greater Southeast Comm. Hosp.,* 625 F.Supp. 991 (D.D.C. 1984) (same) *and Doe v. Eli Lilly & Co.,* 99 F.R.D. 126 (D.D.C.1983) (same) *with Harlan v. Lewis,* 141 F.R.D. 107 (E.D.Ark.1992) (federal rules do not permit ex parte interviews of plaintiffs' treating physicians) *and Manion v. N.P.W. Medical Ctr.,* 676 F.Supp. 585 (M.D.Pa.1987) (same) *and Alston v. Greater Southeast Comm. Hosp.,* 107 F.R.D. 35 (D.D.C.1985) (same) *and Miles v. Farrell,* 549 F.Supp. 82 (N.D.Ill.1982)

(same) *and Garner v. Ford Motor Co.,* 61 F.R.D. 22 (D.Alaska 1973) (same). Even federal district courts within the Eighth Circuit are evenly split as to whether the federal rules permit ex parte physician interviews. *Compare Filz,* 136 F.R.D. 165 (permitting ex parte interviews) *and O'Brien v. Pfizer, Inc.,* No. 3–88–282 (D.Minn. Feb. 21, 1989) (same) *and Jenson v. Playtex Family Prods.,* No. 4–88–908, 1988 WL 235672 (D.Minn. Sept. 19, 1988) (unpublished) (same) *and Carducci v. Mayo Clinic,* No. 3–86–916 (D.Minn. Feb. 24, 1987) (same) *and Thomsen v. Mayo Found.,* No. 4–84–1239, 1986 WL 9159 (D.Minn. Aug. 20, 1986) (same) *with Jepsen v. G.D. Searle & Co.,* No. 4–80–542 D.Minn. April 16, 1988) (prohibiting ex parte interviews) *and Bohrer v. Merrill Dow Pharmaceutical, Inc.,* 122 F.R.D. 217 (D.N.D.1987) (same) *and Simon v. G.D. Searle & Co.,* No. 4–80–160 (D.Minn. May 1, 1986) (adopting without opinion a special master's order that applied state law to deny ex parte interviews in a drug case) *and Weaver v. Mann,* 90 F.R.D. 443, 445 (D.N.D.1981) ("the practice of engaging in private conversations with plaintiff's physicians is not contemplated by the [federal] rules").